**Brooke A. JACKSON, M.D., Plaintiff,**

v.

**THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER, Madeline Duvic, M.D., in her individual capacity, and Robert F. Gagel, M.D., in his individual capacity, Defendants.**

**No. H–00–0531.**

United States District Court, S.D. Texas, Houston Division.

Oct. 30, 2001.

Sheila Beth Owsley, Attorney at Law, Houston, TX, for Brooke A. Jackson, M.D.

Maureen McCarthy Franz, Office of the AG of Texas, Austin, TX, for the University of Texas M.D. Anderson Cancer Center, Madeline Duvic, M.D., and Robert F. Gagel, M.D.

### *MEMORANDUM AND ORDER*

ATLAS, District Judge.

Pending before the Court is Defendants' Motion for Summary Judgment on Plaintiff's Title VII Claim [Doc. # 82] ("Defendants' Motion"). Plaintiff Brooke A. Jack-

son, M.D. ("Jackson") has responded (*see* Plaintiff's Response to Defendants' Motion for Summary Judgment [Doc. # 84] ("Response")), Defendants have replied (*see* Defendants' Reply to Plaintiff's Response to its Motion for Summary Judgment on Plaintiff's Title VII Claim [Doc. # 85] ("Reply")), and Jackson has submitted a rebuttal (*see* Plaintiff's Rebuttal to Defendants' Reply to Plaintiff's Summary Judgment Response [Doc. # 86] ("Rebuttal")). After considering the record and the applicable authorities, the Court concludes that Defendants' Motion should be **granted.**

## I.  *FACTUAL BACKGROUND*

This is a Title VII race discrimination case. Jackson is a medical doctor who is qualified to perform a specialized surgical technique for the removal of skin cancers known as Mohs Mircographic Surgery ("Mohs"). Jackson also specializes in general dermatology and plastic surgery. Defendant M.D. Anderson Cancer Center ("M.D. Anderson") is a part of the University of Texas and employed Jackson from July 1998 to October 1, 1999. Defendant Madeleine Duvic is a medical doctor who was Chief of the Dermatology Section of M.D. Anderson and Jackson's supervisor. Defendant Robert F. Gagel is a medical doctor who was Chairman of the Department of Internal Medicine of Specialties of M.D. Anderson and Duvic's supervisor.

In the mid to late 1990s, M.D. Anderson began developing a Mohs surgery unit, which was to be affiliated with the Dermatology Section in the Department of Internal Medicine Specialties. As Chief of the Dermatology Section, Duvic began to recruit candidates to direct the Mohs unit and perform Mohs surgery. By the Spring of 1998, Duvic narrowed the field of candidates to Jackson and Dr. Michelle Algarin.[1] Affidavit of Madeleine Duvic, M.D., at Defendants' Appendix ("Def.App."), at 0146–48[2] (Ex. B. to Defendants' Motion) ("Duvic Affidavit").

Jackson completed a Mohs Surgery Fellowship in 1998 in Houston. Prior to her Mohs fellowship, Jackson had completed a residency in dermatology in 1994 and a fellowship in laser surgery in 1995. She had been a medical school faculty member at Harvard University and the University of Illinois between 1994 and 1998. Algarin at this point was enrolled in a Mohs surgery residency which she would not complete until the following year. *Id.* Duvic had previously worked with Algarin and hoped to have her join M.D. Anderson when she finished her residency.[3] *Id.* Jackson was offered the position.

1. Dr. Algarin is married. The parties sometimes refer to her in the record under her maiden name, Dr. Gollar. Duvic Affidavit, Def.App., at 0146.

2. Defendants submitted an extensive Appendix in support of their Motion. Although there are various documents and deposition transcripts contained in the Appendix, all the pages, regardless of subsection or document, are numbered sequentially, and the original numbers are obliterated. Thus, the Court simply cites to the Appendix page numbers.

3. According to Duvic, she considered several options regarding Algarin's potential employment at M.D. Anderson. These included (i) hiring Algarin to replace Jackson when Algarin completed her training, or (ii) pursuing the institution of a second Mohs surgery position. Duvic Affidavit, Def.App., at 0148–49. Shortly after she began work at M.D. Anderson, Jackson discovered a memorandum in which Gagel mentioned the fact that he and Duvic were considering the possibility of hiring Jackson for a one year period until Algarin finished her residency and was able to fill the post. Jackson Deposition, at 215; Memorandum from Robert Gagel, M.D. to Madeleine Duvic, M.D., June 5, 1998 (Ex. 1 to Plaintiff's Response) ("Algarin Memo"). In the Algarin Memo, Gagel states: "[i]t was my sense from our discussion that you were thinking of Doctor Jackson as an interim solution while Doctor Algarin pursues additional training." Both Duvic and Gagel testified

During the interview process, Duvic and Jackson discussed the terms of Jackson's potential employment. Duvic Affidavit, Def.App., at 0147–48; Deposition of Brooke A. Jackson, M.D., at 9–20 (Ex. A to Defendants' Motion) ("Jackson Deposition"). They discussed Jackson establishing and developing the Mohs Surgery Unit, and serving as its director. *Id.* Jackson contends that Duvic stated that the salary would be $160,000 and the appointment would be for a tenure track position. *Id.* at 19, 29. Jackson also mentioned her interest in pursuing a private cosmetic surgery practice outside of M.D. Anderson. *Id.* at 18. Jackson reports that Duvic did not object to Jackson's private practice.[4] *Id.* Duvic maintains that all of these topics were discussed in general terms during the interview. Duvic Affidavit, Def.App., at 0147–48. She further avers that she did not have final authority to grant any of these requests and that she did not make any guarantees to Jackson. *Id.* at 0146–48. Plaintiff does not produce evidence that contradicts Duvic's statements as to Duvic's authority.

Jackson commenced employment with M.D. Anderson in July 1998. When Jackson arrived at work, she was given a formal "offer" letter stating the terms of her employment. *See* Letter from Andre von Eschenbach, M.D. to Brooke Ashley–Ann Jackson, M.D., July 31, 1998 (Ex. 2 to Jackson Deposition) ("Offer Letter"). The Offer Letter stated the following in contradiction to Jackson's understanding of the terms of her employment: (i) her position was "Director *ad interim* of Mohs Surgery, (ii) she was given a one-year *nonrenewable* term of employment, (iii) she was given a salary of *$150,000,* and (iv) she received a *non-tenured clinical appointment* ("NTCA")". *Id.* (emphasis added). The Offer Letter also stated that Jackson would be subject to the terms and conditions of the Physicians Referral Service ("PRS"). *Id.* Shortly thereafter, Jackson learned that she would be unable to pursue a cosmetic surgery practice independent of M.D. Anderson under the terms of the PRS. Jackson Deposition, at 37.

Jackson spoke to Duvic about what she viewed as the discrepancies between the Offer Letter and their prior conversations. Duvic agreed that the "nonrenewable" language should be removed from the Offer Letter, telling Jackson she had no plans to "get rid" of her. Jackson Deposition, at 44–47. Duvic also stated that she would attempt to have Jackson's salary raised to $160,000 but that the plastic surgery and head and neck departments had objected to the Mohs surgeon's salary at $160,000.[5] In September 1998, however, Jackson's salary was raised to $160,000 but was not made retroactive to her July starting date because the prior pay period was in a fiscal year that already was closed. *Id.* at 60–61.

Jackson also spoke with Defendant Gagel regarding the PRS restriction on outside practice. Gagel suggested that Jackson would be able to pursue her cosmetic surgery practice if she (i) became a less than full-time employee,[6] with a corresponding reduction in salary, or (ii)

---

that they quickly abandoned the idea replacing Jackson with Algarin. Duvic Affidavit, Def.App., at 0148–49; Affidavit of Robert Gagel, M.D., Def.App., at 0155–56 (Ex. C to Defendants' Motion) ("Gagel Affidavit").

4. Duvic claims, however, that she informed Jackson that there were rules and regulations regarding such activities. Duvic Affidavit, Def.App., at 0147–48.

5. Allegedly, both plastic and head and neck surgery require more training than Mohs surgery. The plastic surgery and head and neck department objected because the starting salaries for surgeons in those department were close to $160,000. Jackson Deposition, at 48, 69.

6. The PRS does not apply to part-time employees.

convinced M.D. Anderson to develop a cosmetic surgery unit.[7] *Id.* at 54–55; Memorandum from Robert Gagel, M.D. to Brooke Jackson, M.D., October 26, 1998 (Ex. 8 to Jackson Deposition).

Jackson had inconclusive discussions regarding her non-tenure track position with Gagel.[8] Jackson was never placed in a tenure track position prior to resignation in September 1999.

Jackson points out that, during her employment at M.D. Anderson, Jackson suffered what she perceived to be a number of slights. First, Jackson claims that she was assigned to conduct her patient clinics at times when there were no residents available to help her, and that she was the only dermatology physician who had no resident support. Jackson Deposition, at 122. Second, Jackson claims that other physicians interfered with the use of her medical and secretarial support staff. As Director of the Mohs unit, Jackson was assigned a histotechnician. *Id.* at 142. Jackson contends that Duvic imposed on her by demanding that the histotechnician also perform work for Duvic.[9] *Id.* Jackson also contends that she had little or no

secretarial support because she shared a secretary with Duvic, whose work the secretary made a priority.[10] *Id.* at 136. Finally, Jackson complains about work that she performed in ordering supplies and equipment for the Mohs surgery unit. Jackson claims that she was not informed that such work is usually performed by the M.D. Anderson business manager. *Id.* at 140–41. Jackson asserts that Duvic imposed these requirements on her because of her race. *Id.* at 146.

Jackson continued to be concerned that she would be replaced by Algarin, and complained that Gagel and Duvic did not respect her authority as Director of the Mohs surgery unit. Jackson states that she was not informed of plans to hire a second Mohs surgeon, and that as Director of the unit, she should have participated in the decision. Jackson Deposition, at 213–14. Jackson learned that Duvic and Gagel were considering hiring Algarin as a second Mohs surgeon. *Id.* Gagel subsequently assured Jackson that no hiring decision would be made without her input. E–Mail from Robert F. Gagel to Brooke A. Jackson (Dec. 18, 1998, 06:48 PM).

7. There was another way that a physician at M.D. Anderson could maintain an outside practice: the physician could be hired as a consultant by M.D. Anderson. Jackson was not given the option to be a consultant because Texas regulations prohibit any person who is a full time employee at M.D. Anderson from becoming a consultant within one year after the full time employment ended. Jackson Deposition, at 84–86; Gagel Affidavit, Def.App., at 0156. M.D. Anderson, in reliance upon its legal department's opinions, maintained that, even though Jackson had not yet signed a written contract with M.D. Anderson, her acceptance of a paycheck constituted an employment relationship. Jackson Deposition, at 85.

8. In one conversation in July or August of 1998, Gagel informed Jackson that it was an "option" for her to switch to a tenure track position. Jackson Deposition, at 157. In an

e-mail, Gagel states to Jackson that he would like to "begin to discuss the all important promotion and tenure process." Jackson Deposition, at 224–25; E–Mail from Robert F. Gagel to Brooke A. Jackson (Dec. 18, 1998, 06:48 PM).

9. Jackson also notes that, during the process of hiring the histotechnician, who is African–American, Duvic expressed preference for a white candidate who had worked with Duvic at the medical school. *Id.* at 143–45. Jackson claims that Duvic supported the white candidate despite the fact that the white candidate requested a work schedule that was difficult to accommodate. *Id.*

10. Nevertheless, Jackson never asked Duvic or anyone at M.D. Anderson to provide her with better secretarial support. Jackson Deposition, at 136–37.

Jackson has submitted evidence that, of the approximately 700 physicians and surgeons employed at M.D. Anderson, she was one of only eleven African–American doctors. Jackson Deposition, at 61–63. Jackson was the only African–American faculty member in the Dermatology Section. *Id.* at 122. Only one of the other ten African–American doctors held a tenure-track position. *Id.*

Jackson submitted a letter of resignation to Duvic on September 10, 1999, and ceased working at M.D. Anderson on October 1, 1999. Duvic immediately began to look for a replacement. Duvic offered Jackson's position to Dr. Aaron Josephs, a Mohs surgeon with an established private practice. According to Duvic, Josephs initially refused to accept the position. Duvic Affidavit, Def.App., at 0150. Eventually, Duvic and Josephs agreed that Josephs would hold a consultant position at M.D. Anderson and could maintain his private practice. *Id.* Duvic and Josephs initially negotiated an arrangement whereby Josephs would receive around 90% of the fees that M.D. Anderson collected for the Mohs surgery he performed. Letter from Madeleine Duvic, M.D. to Aaron Josephs, M.D., September 23, 1999 (Ex. 23 to Plaintiff's Response) ("Josephs Letter"). Duvic estimated that based on Jackson's "productivity this would be a reasonable amount." *Id.* Ultimately, however, Josephs and M.D. Anderson settled on an undisclosed fixed fee arrangement. Duvic Affidavit, at Def.App., at 0150–51.

Jackson filed suit on February 18, 2000 alleging breach of contract, constructive discharge, and race discrimination. *See* Plaintiff's Original Complaint [Doc. # 1]. On July 14, 2000, long after this case was commenced, Jackson filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging race and gender discrimination. The EEOC issued to Jackson a "right to sue" notice on January 12, 2001.

Meanwhile, Defendants filed motions to dismiss and motions for summary judgment.[11] Based on these motions, the court dismissed all of Jackson's claims except for a Title VII discrimination claim. *See* Memorandum and Order, signed April 12, 2001 [Doc. # 68]. Jackson filed a Third Amended Complaint on June 4, 2001 [Doc. # 72] ("Complaint"), alleging race discrimination under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

Defendants have moved for summary judgment on the Title VII claim, the sole remaining cause of action. Jackson has responded and the matter is ripe for determination.

## II. *SUMMARY JUDGMENT STANDARDS*

A defendant's motion for summary judgment is properly granted unless there is evidence "on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wheeler v. Miller,* 168 F.3d 241, 247 (5th Cir.1999). Rule 56 is an integral part of the Federal Rules of Civil Procedure, recognizing a party's right to demonstrate that certain claims have no factual basis and to have those unsupported claims disposed of prior to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

11. The case was referred to Magistrate Judge Calvin Botley pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). The Court adopted in part and rejected in part the Memorandum and Recommendations of the Magistrate Judge Botley, and supplemented his opinion. *See* Memorandum and Order, signed April 12, 2001 [Doc. # 68].

Once the movant shows that there are no genuine issues of material fact, the burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial. *Texas Manufactured Housing Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied*, 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Independent School Dist.*, 153 F.3d 211, 215 (5th Cir. 1998); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*).

The Court "must review all of the evidence in the record, but make no credibility determinations or weigh any evidence." *Peel & Company, Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir.2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000)). "In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached." *Id.*

"Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir.1991). Rumors, speculation, hearsay and other information which would be excluded at trial cannot be considered in ruling on a motion for summary judgment. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir.1995).

## III. TIME LIMIT FOR FILING EEOC CHARGE

■ Defendants contend, first, that Jackson did not timely file her charge with the EEOC, and therefore she is barred from bringing this action. Defendants claim that the time to file a charge with the EEOC is 180 days after the alleged discrimination occurs. Jackson contends that her charge was filed within the applicable period, which she contends is 300 days after the alleged discrimination occurred.

Under the express terms of Title VII, a plaintiff must file a charge of discrimination with the EEOC within 180 days "after the alleged unlawful employment practice occurred" before bringing a court action against the employer. 42 U.S.C. § 2000e–5(e)(1). Congress intended the limitations period contained in § 2000e–5(e)(1) to act as a statute of limitations. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393–94, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 537 (5th Cir.1998). However, if the plaintiff has instituted proceedings with a state or local agency with authority to grant or seek relief for the alleged discriminatory practice, the limitations period for filing a charge with the EEOC extends to 300 days. 42 U.S.C. § 2000e–5(e)(1); *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998); *Webb*, 139 F.3d at 537.

In Texas, the pertinent state agency is the Texas Commission on Human Rights ("TCHR"). In 1989, the EEOC and the TCHR entered into a Worksharing Agreement ("EEOC/TCHR Agreement") that was designed to minimize duplication of effort in the processing of charges between the two agencies.[12] *Vielma v. Eureka Co.*,

---

12. The Agreement is renewed annually, and had been extended for the fiscal year 2000.

The Court takes judicial notice of the fact that the Agreement was in force when Jackson

218 F.3d 458, 462 (5th Cir.2000). In the EEOC/TCHR Agreement, both the EEOC and the TCHR designate each other as agents for the purpose of receiving charges.[13] *Vielma,* 218 F.3d at 462. The Fifth Circuit has held that, as a result of the EEOC/TCHR Agreement, a complaint filed with the EEOC will also be considered filed with the TCHR. *Vielma,* 218 F.3d at 462–63 ("[W]hen a complainant files her initial charge with the EEOC, her charge will also be filed with the TCHR."); *Griffin v. City of Dallas,* 26 F.3d 610, 612 (5th Cir.1994) ("[U]pon the EEOC's receipt of [a] complaint, the TCHR, for all legal and practical purposes, receive[s] the complaint."). Thus, as a practical matter this Agreement extends the time period to file discrimination charges with the EEOC in Texas to 300 days. *Griffin,* 26 F.3d at 612–13 (holding that the filing period is extended to 300 days under the terms of the Agreement once the complaint is filed with the EEOC); *Adams v. Cal–Ark International, Inc.,* 159 F.Supp.2d 402, 408 (E.D.Tex.2001) ("Plaintiff's filing of her charge with the ... EEOC was sufficient to institute state proceedings with the TCHR and extend the limitations period to 300 days.").

Jackson filed a charge of discrimination with the EEOC on July 14, 2000. Under the terms of the EEOC/TCHR Agreement, the charge is deemed also filed with the TCHR. Thus, the 300 day rule will be applied.[14]

The last allegedly discriminatory act by Defendants of which Jackson complains was her alleged constructive discharge from M.D. Anderson on October 1, 1999. This event falls within the 300 day period. Jackson's claims for conduct by Defendants *on or after* September 13, 1999 are timely.

## IV. *JACKSON'S CONSTRUCTIVE DISCHARGE CLAIM*

Jackson submitted her resignation from M.D. Anderson on September 10, 1999, and left its employ on October 1, 1999. Jackson contends that her resignation was a result of the discriminatory treatment she experienced while working there. Thus, Jackson argues that she was constructively discharged from her position. Jackson relies on the following factors in support of her claim for constructive discharge: (i) Jackson was not permitted to maintain a private cosmetic surgery practice while at M.D. Anderson; (ii) Jackson believed that Defendants had

---

filed her complaint with the EEOC on July 14, 2000.

**13.** The most recent version of the EEOC/TCHR Agreement, executed in fiscal year 1999 and extended through fiscal year 2000 states: "In order to facilitate the assertion of employment rights, the EEOC and the [TCHR] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges." EEOC/TCHR Agreement, § II(A). The Court of Appeals in *Vielma* noted that the relevant language in the 1999 Agreement is "essentially unchanged" from the 1989 Agreement, which the Court of Appeals cited in *Griffin. Vielma,* 218 F.3d at 462 n. 3.

**14.** The Court recognizes that Jackson, despite being represented by counsel at the time, did not indicate specifically on the form that she wanted it filed with the TCHR, as well as the EEOC. Jackson failed to fill in the blank at the top of the charge form entitled "State or local agency, if any [space for the agency's name] and EEOC." However, Jackson checked the box at the bottom of the form that stated: "I *also* want this charge filed with the EEOC [emphasis added]," implying that she thought the form was being filed somewhere other than the EEOC. Ultimately, the charge was given only an EEOC file number. There is no indication that it was ever sent to, seen or handled by the TCHR.

intended to replace her with another Mohs surgeon after one year; and (iii) Defendants initially appointed Jackson to a nonrenewable non-tenure track position in contradiction to Jackson's understanding of her employment offer. In opposition, Defendants argue that Jackson has failed to present evidence that working conditions at M.D. Anderson were so intolerable that a reasonable person in Jackson's position would feel compelled to resign.

To prove constructive discharge, a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.2001); *Brown v. Bunge Corp.*, 207 F.3d 776, 783 (5th Cir.2000). In determining whether a reasonable employee would feel compelled to resign, courts consider the relevancy of factors such as: (i) demotion; (ii) reduction in salary; (iii) reduction in job responsibilities; (iv) reassignment to menial or degrading work; (v) reassignment to work under a younger supervisor; (vi) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (vii) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Kinney Shoe*, 237 F.3d at 566; *Bunge Corp.*, 207 F.3d at 782. Constructive discharge requires a greater degree of harassment than a hostile work environment claim. *Kinney Shoe*, 237 F.3d at 566. Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote. *Id.*

Jackson patently has failed to meet her burden to raise a fact issue that she was constructively discharged from her position at M.D. Anderson. Jackson's complaints that Defendants did not permit her to have a private cosmetic surgery practice while employed at M.D. Anderson, but permitted her successor to continue his existing private practice and work as a consultant does not satisfy the constructive discharge standard. At most, this is an example of disparate treatment, not intolerable working conditions.[15]

Jackson's awareness of Duvic's and Gagel's original idea to replace her after a year may have made her uncomfortable, but she discussed the matter with Defendants on several occasions, and received assurances that her employment would not be terminated after one year.[16] Defendants' failure to place Jackson on a tenure track within the year she worked at M.D. Anderson also is insufficient to meet the constructive discharge standard. The record indicates that Defendants were open to a tenure track possibility. Jackson Deposition, at 157, 224–25. By the time Jackson elected to resign from M.D. Anderson, her contract had been extended for an additional year and Algarin, her proposed replacement, had taken a position elsewhere. Memorandum from John Mendelsohn, M.D. to Brooke Ashley–Ann Jackson, M.D., Sept. 1, 1999 (Exhibit 2 to

---

**15.** All full time employees at M.D. Anderson were bound by the terms of the PRS and the relevant state regulations that prohibited physicians from having private practices. Defendants' failure to heed Jackson's wish to have a private plastic surgery practice, does not make working conditions at M.D. Anderson so intolerable that a reasonable person would be *compelled* to resign. Indeed Defendants expressed a willingness to work out a compromise to allow Jackson to have a private practice.

**16.** *See* Memorandum from Robert F. Gagel, M.D. to Brooke Jackson, M.D., October 26, 1998 (Exhibit 8 to Jackson Deposition) (assuring Jackson that Gagel and Duvic will seek a renewal of her contract). Defendants also removed the "nonrenewable" language from Jackson's contract at her request. Jackson Deposition, at 44–47.

Callender Affidavit) (appointing Jackson for a second year at M.D. Anderson); Duvic Deposition, at 7–10. There simply is no triable issue of fact as to whether Jackson worked under conditions so intolerable that a reasonable person in her position would feel compelled to resign. Accordingly, Jackson's constructive discharge claim fails as a matter of law.

Since the constructive discharge cause of action is Plaintiff's only timely claim, and that claim is not legally viable, Plaintiff's entire Title VII claim fails, unless salvaged by the "continuing violation" doctrine. However, the parties have not briefed this issue. The Court will address it in the interests of justice.

## V. CONTINUING VIOLATION

■ Other than her alleged constructive discharge, Jackson complains only of events prior to September 13, 1999.[17] Indeed, Jackson announced her resignation on or about September 10, 1999.

The Fifth Circuit recently summarized its jurisprudence on the continuing violation doctrine. "A plaintiff seeking to invoke this doctrine must demonstrate more than a series of discrete discriminatory acts: 'He must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action.'" *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir.2001) (quoting *Huckabay v.*

*Moore*, 142 F.3d 233, 239 (5th Cir.1998) (internal citations omitted)). The Fifth Circuit has identified "at least three factors that may be considered in determining if a continuing violation exists: (1) Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? (2) Are the alleged acts recurring or more in the nature of an isolated work assignment or incident? (3) Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights?" *Id.* (citing *Huckabay*, 142 F.3d at 239).

Claims of disparate treatment, such as failure to hire, promote, or train and dismissals or demotions, are "the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued." *Id.* (citing *Huckabay*, 142 F.3d at 240). These "discrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment" and therefore, if otherwise untimely, are not actionable by virtue of the continuing violation doctrine. *Id.* An employee who claims violations such as these is put on notice that his rights have been violated at the time the adverse employment decision occurs.

In addition, in hostile environment contexts, "the continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period," such that a valid connection exists between them.[18] *Id.* at 352

---

17. The Court has scrutinized both Jackson's pleadings and arguments in response to Defendants' Motion Plaintiff argues only about incidents of disparate treatment prior to that date.

18. Jackson does not allege, and does not show, a hostile work environment at M.D. Anderson. A *prima facie* case of racial harassment alleging hostile work environment consists of five elements: (1) the employee belongs to a protected group; (2) the

employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine*, 266 F.3d at 352–53; *Watts v. Kroger Co.*, 170 F.3d 505, 509–10 (5th Cir.1999). For harassment to affect a "term, condition, or privilege of employment"

(citing *Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir.2000)). "[W]here a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she can not reach back and base her suit on conduct that occurred outside the statute of limitations." *Id.* (citing *Hardin*, 167 F.3d at 344); *see also Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 537 (5th Cir. 1998) (explaining that, under the continuing violation doctrine, the plaintiff still must show a series of acts, one or more of which fall within the limitations period).

Jackson's claims of discrimination are largely claims of disparate treatment in connection with the contract offered to her by Defendants when she was hired. Jackson specifically complains that she initially received a salary $10,000 per year below what she was promised and what the plastic surgeons allegedly received, that she was denied the right to develop a private medical practice, that she was given only a one year appointment, and that she was not given a tenure track position. She also complains about working conditions, such as the lack of adequate resident, secretarial and histotechnician support, her exclusion from decision-making affecting her Mohs unit within the Dermatology Department (such as whether to hire a second physician), and her responsibilities to order supplies.[19] Jackson's contentions

fail as a matter of law to state a claim on which Jackson may recover damages or other relief.

The facts giving rise to Jackson's disparate treatment claims in connection with the terms of employment originally offered were known to her from the outset of her employment at M.D. Anderson. As to the discrepancy between Jackson's understanding of her deal with Defendants and the actual employment contract she was offered, Jackson alleges a discrete event and not a pattern.[20] The allegedly discriminatory act had a sufficient degree of permanence to have triggered Jackson's awareness of and duty to assert her rights. Thus, the continuing violation doctrine has no application in this case as to the hiring decisions challenged by Jackson.

Similarly, the alleged absence of adequate resident, secretarial and histotechnician support, her alleged exclusion from decision-making, and the requirement that she order her unit's supplies were apparent to her when these events occurred and well before she decided to resign on September 10, 1999. Jackson alleges these problems existed and were constant from the early stages of her employment onward. Construing Jackson's complaint in the light most favorable to her, some of the matters of which she complains (inadequate staff support or duty to order supplies) could be deemed recurring, as a

it must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Celestine*, 266 F.3d at 353. Even if Jackson had raised a hostile work environment claim, she could not raise a genuine issue of fact that Defendants' actions were so severe and pervasive that Jackson was subjected to an abusive working environment.

19. It is unclear if these latter items are intended as allegations of a hostile environment claim, or merely asserted for their putative evidentiary value to show discriminatory in-

tent by Defendants. Jackson also alleges a conspiracy among the Defendants to hire her for only one year, contrary to the representations they made to her when she interviewed. This argument adds nothing to the substance of the discrimination claims she asserts.

20. The efforts Defendants made to correct the apparent misunderstanding was what extended this matter over time. Efforts to reconcile the parties' difference on these employment terms do not amount to a series of discriminatory events.

pattern. However, this putative pattern was evident to Jackson long before 300 days prior to her filing her EEOC charge.[21] Thus, even if these allegedly wrongful actions were deemed disparate treatment as to conditions of employment or a form of harassment, Jackson may not base her suit on conduct that occurred outside the statute of limitations.

The Court thus is forced to conclude that Jackson has failed to state a claim under Title VII on which relief may be granted since all her claims accrued outside the 300 day limitations period. Since the parties have analyzed this case on the merits, however, the Court will address Jackson's theories as well.

## VI. *TITLE VII DISPARATE TREATMENT CLAIM*

### A. *Analytical Framework*

The Supreme Court established the analytical framework for addressing Title VII race discrimination claims based on circumstantial evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir.2000). Under the burden-shifting framework of *McDonnell Douglas*, a plaintiff first must establish a *prima facie* case of race discrimination. *Russell*, 235 F.3d at 222. For her employment *prima facie* discrimination claim, Jackson must show: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) that others similarly situated were treated more favorably than her. *Okoye v. University of Texas Houston Health Sci.*

*Ctr.*, 245 F.3d 507, 513 (5th Cir.2001); *Rutherford v. Harris County, Texas*, 197 F.3d 173, 184 (5th Cir.1999).

If the plaintiff has made a *prima facie* showing, the defendant may respond by producing a legitimate, non-discriminatory rationale for the adverse employment action regarding the plaintiff. *Russell*, 235 F.3d at 222. The burden on defendant is one of production—and not of persuasion [22] —which means that a "defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions, which *'if believed by the trier of fact,'* would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999). Where the defendant on a motion for summary judgment articulates and presents evidence of its non-discriminatory reason for the adverse employment action, the court need not decide whether plaintiff has established a *prima facie* case. *Britt v. Grocers Supply Co., Inc.*, 978 F.2d 1441, 1450 (5th Cir.1992).

Finally, if the defendant carries its burden, the plaintiff must provide evidence that shows the defendant's purported reasons are a pretext for discrimination. *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. The trier of fact may conclude that the defendant discriminated unlawfully based on "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147, 120 S.Ct. 2097.

---

21. Plaintiff did not even file her charge until six months *after* filing this lawsuit.

22. The burden of persuasion remains at all times with the plaintiff. *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir.2000).

Nevertheless, the fact finder's rejection of the employer's legitimate, nondiscriminatory reasons for its action does not compel judgment for the plaintiff. *Reeves*, 530 U.S. at 146–47, 120 S.Ct. 2097. There will be instances where no rational fact finder could conclude that the defendant's action was discriminatory even though plaintiff has established a *prima facie* case and has presented sufficient evidence to reject the defendant's explanation. *Id.* at 148, 120 S.Ct. 2097. For example, the inference of discrimination may not arise if the circumstances show that the defendant gave the false explanation to conceal something other than discrimination. *Id.* Put another way, it is not enough "to *dis* believe the employer;the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147, 120 S.Ct. 2097. *See also Rubinstein v. Administrators of the Tulane Educational Fund*, 218 F.3d 392, 400 (5th Cir.2000) ("discrimination suits still require evidence of discrimination.").

The ultimate determination is "whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir.2000). In making this determination, a court should consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Id.*

### B. *Pretext Analysis*

Jackson argues that Defendants discriminated against her on the basis of her race.

Jackson essentially bases her claim on: (i) the initial (one month) discrepancy between her promised annual salary of $160,000, and the actual starting annual salary of $150,000; (ii) the restriction on her ability to engage in a private cosmetic surgery practice outside the hospital; and (iii) the alleged conspiracy to replace her with another Mohs surgeon at the end of one year. She avers that Defendants treated similarly situated white employees more favorably in these respects.

Defendants contend that Jackson has not presented sufficient evidence to support her *prima facie* case. Specifically, Defendants contend that no evidence supports Jackson's assertions that (i) she suffered an adverse employment action, and (ii) she was treated less favorably than similarly situated white employees.[23] Furthermore, Defendants articulate nondiscriminatory justifications for each of the actions of which Jackson complains. Jackson presents evidence specifically in response to Defendants' articulated reasons for their conduct, and also presents anecdotal evidence that Defendant Gagel allegedly discriminated against Dr. Vickie Shannon, an African–American doctor employed by M.D. Anderson in the Department of Surgery. In addition, Jackson offers statistical evidence regarding the number of African–American doctors employed by M.D. Anderson.

Because Defendants have offered nondiscriminatory reasons for their actions, the Court will assume that Jackson has established a *prima facie* case. Accordingly, the Court will address the pretext issue.[24]

**23.** The first two prongs of Jackson's *prima facie* case are undisputed. Defendants' Motion, at 9 ("[T]here is no dispute that Jackson is an African–American female and that she was qualified for the position that she held as an employee at MD Anderson.").

**24.** As a practical matter, the plaintiff's *prima facie* case and pretext issue are analytically

similar. The Fifth Circuit has applied the "similarly situated" standard from the plaintiff's *prima facie* case interchangeably with the "nearly identical" standard for the plaintiff's pretext analysis. *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1062 (5th Cir. 1998) (the plaintiff "could have established a prima facie case of disparate treatment by

### 1. Starting Salary

■ Jackson argues that she was treated less favorably than nearly identical white physicians when she received a starting salary of $150,000 per year. Jackson compares herself to plastic surgeons, and two other Mohs surgeons.

Defendants' non-discriminatory reasons for this discrepancy are as follows: First, Defendant Duvic claims that she recommended to her superiors that Jackson receive $160,000 per year, the salary Duvic informally offered Jackson and that Jackson therefore expected, based upon her interview with Duvic. Duvic Affidavit, Def.App., at 0147; Jackson Deposition, at 19. Defendants also provide evidence that Duvic did not have the authority to grant Jackson that salary. Duvic Affidavit, Def. App., at 0147. Jackson reports that Duvic's superiors stated that Jackson's lower salary was designed to achieve parity with starting salaries of surgeons in the plastic surgery and head and neck departments at M.D. Anderson. Jackson Deposition, at 69. Defendants explain that these other surgeons had more extensive training or had trained for longer periods of time. *Id.*, Def.App., at 0149.

Jackson argues that this aspect of Defendants' explanation is false, as revealed by an investigation by Dr. Harry Gibbs, M.D., Anderson's Vice President of Diversity conducted around September 1998. This investigation reflected that the lowest paid plastic surgeon at M.D. Anderson at the time of the inquiry received $180,000 per year. This evidence fails to raise a genuine question of fact as to her salary

disparity contention. Gibbs reported only *current* salaries of *all* of M.D. Anderson's plastic surgeons as of September 1998. Deposition of Harry Gibbs, M.D., at 36–37, 40 (Exhibit 29 to Plaintiff's Response) ("Gibbs Deposition"). Gibbs admitted that he did not know whether these current salary figures represented the plastic surgeons' *starting* salaries in June or July 1998—the fiscal year prior to the month of his study—when Jackson's salary was negotiated and then set. *Id.* Jackson has failed to demonstrate that Defendants' explanation was false. Plaintiff also has not demonstrated that her training and experience was "nearly identical" to the plastic surgeons with whom she and Defendants compared her. Thus, she has not shown that Defendants' nondiscriminatory justification for her original $150,000 salary was false.

Defendants also submitted, in support of their explanation of Jackson's initial salary, the testimony of David Callender, the Senior Vice President and Chief Medical Officer at M.D. Anderson. Callendar explains that the decision to offer Jackson $150,000 was made after "discussions with various faculty members and staff at [M.D. Anderson] as to an appropriate starting salary." Affidavit of David Callender, M.D., Def.App., at 0158 (Exhibit D to Defendants' Motion) ("Callender Affidavit"). Jackson contends, on the other hand, that Gagel made the discriminatory decision. Jackson has not produced any evidence that Gagel had any involvement or knowledge of the salary decision at the time it

showing [employees outside the protected class] received raises and bonuses under circumstances 'nearly identical to his.' "); *see also Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir.1995). When a claim for disparate treatment is offered to establish pretext, the plaintiff must show that the employer gave preferential treatment to another employee under "nearly identical" circum-

stances. *Okoye,* 245 F.3d at 514. Thus, the Court notes that, had it not assumed that Jackson has established the *prima facie* case, any facts that show that Defendants did not give preferential treatment to another employee under nearly identical circumstances would also likely show that Jackson was not similarly situated to that employee.

was made. Gagel disclaimed knowledge of M.D. Anderson's original decision to pay Jackson $150,000. Gagel Deposition, at 9. Gagel testified that he did not oppose setting Jackson's salary at $160,000. Gagel Deposition, at 8–9. Gagel also testified that he could make salary recommendations but did not have final authority to determine the salary of doctors at M.D. Anderson. Gagel Affidavit, Def.App., at 0156; Deposition of Robert Gagel, M.D., at 6–7 (Exhibit 27 to Plaintiff's Response) ("Gagel Deposition"). Jackson merely responds in conclusory fashion that Defendant Gagel had the authority to determine her salary and that Gagel falsely disclaims responsibility for, and awareness of, the decision to offer her $150,000. Jackson's conclusory statements are insufficient to raise a genuine fact question on the issue of her salary.

■ Jackson also points to evidence that Defendant Gagel offered $160,000 to a Dr. Walsh, a Caucasian male Mohs surgeon, prior to Jackson being hired, and offered $175,000 to a Dr. Zealec, a Hispanic male Mohs surgeon, in the year 2000, two years after Jackson was hired and had left M.D. Anderson.[25] *See* Gagel Deposition, at 15, 65. Jackson offers no other evidence to show that the offers to the other candidates were made in circumstances nearly identical to hers, other than that generally they were all Mohs surgeons. There is no evidence that these men were similar to Jackson in their experience, training or other credentials. Second, Defendants raised Jackson's annual salary to $160,000 approximately one month after she brought the matter to Defendants' attention. Jackson Deposition, at 60–61. Moreover, particularly as to Dr. Zealac, the two-year difference in timing of the offers is material. Jackson's

evidence thus fails to raise a genuine fact question in this regard. Jackson offers no other evidence that Defendants' explanation regarding her initial salary is pretextual. Accordingly, the Court finds that Jackson's Title VII claim fails on this issue.

### 2. Private Cosmetic Surgery Practice

■ Jackson maintains that she suffered unlawful disparate treatment in that she was prohibited from engaging in an private cosmetic surgery practice while employed by M.D. Anderson. Jackson contends that this restriction was discriminatory because Dr. Aaron Josephs, the Mohs surgeon hired to replace her, was Caucasian and was allowed to maintain an outside private practice.

The background to this issue is as follows: During the interview process, Jackson mentioned to Duvic that it was important for her professionally to be able to maintain a private plastic surgery practice while working as a Mohs surgeon at M.D. Anderson. Jackson Deposition, at 18. Duvic stated she personally did not object to Jackson engaging in private practice. Duvic Affidavit, Def.App., at 0147. Upon Jackson's arrival at M.D. Anderson, she was informed that she would have to abide by the terms of the Physicians Referral Service ("PRS") policy and regulations, which prohibited employees of M.D. Anderson from maintaining an outside practice. Jackson Deposition, at 37. Jackson had several meetings with M.D. Anderson's representatives to determine her options regarding this issue. *Id.* at 54–55. Jackson discussed several options with Defendants, including the possibility of switching to a consultant status. *Id.* at 54–55, 84–86. As a consultant, Jackson

---

**25.** Although this change was not made retroactive to Jackson's first month of employment, *id.,* Defendants' explanation, which

Jackson does not contradict, was that the fiscal year had closed for the first month that Jackson worked at the hospital.

would be able to maintain an outside practice because consultants are not bound by the PRS. *Id.* at 84–86. Ultimately, however, Defendants informed Jackson that she could not become a consultant because Jackson, as a full time employee, was prohibited by Texas law from becoming a consultant for a year after her full-time status at M.D. Anderson ended. *Id.* In Defendants' view, Jackson was a full time employee despite the fact that she had not signed her employment contract, since she accepted a paycheck for full time employment at M.D. Anderson. *Id.*

Jackson responds that, after her resignation, Duvic offered the Mohs position to Dr. Aaron Josephs, who initially declined the offer. *See* Duvic Affidavit, Def.App., at 0150. Thereafter, Duvic offered Josephs a consultancy that would allow him to maintain his private practice while performing Mohs surgery at M.D. Anderson. *Id.* Jackson contends that the terms of the offer to Josephs constituted discrimination against her because M.D. Anderson did not offer and grant her similar terms when she started at the hospital.

Jackson's effort here is unavailing. She has not shown that Josephs was offered the position under nearly identical circumstances.[26] It appears that Josephs had more experience than Jackson, and already had an established private practice. Josephs was hired only after Jackson had resigned, hired at a time the hospital had an unexpected vacancy created by Jackson's departure on less than thirty days notice. Jackson's resignation left M.D. Anderson without a Mohs surgeon to perform surgery in the then existing Mohs surgery program.[27] Thus, Josephs was hired under a very different situation from Jackson. In any event, Josephs initially was offered a position as an employee subject to the PRS rules, the same arrangement Jackson had. Only after Josephs rejected the full-time employee position and the hospital was desperate to fill the vacancy quickly, was he offered the consultant position. Finally, unlike Jackson, Josephs was eligible for the consultancy position because he had not already been an employee of M.D. Anderson.

In addition, there is no evidence that Defendants created or relied on the PRS (or related state law and regulations)[28] for discriminatory or bad faith reasons. Jackson does not dispute the applicability of the PRS or the regulations to her situation.

Plaintiff has failed to raise a genuine question of material fact that Defendants' explanations for the refusal to permit Jackson to have a private practice while working and being paid full time by M.D. Anderson are false. To the contrary, the Court finds that Defendants attempted to reach a compromise with Jackson. Indeed, Jackson does not appear to dispute that Defendants were willing to (i) allow Jackson to work part-time, with a 10% reduction in salary, so that she could main-

---

26. The Court notes that, had it not assumed that Jackson has satisfied her *prima facie* burden, these same facts would show that Jackson has not shown herself to be similarly situated to Josephs.

27. In the Josephs Letter, in which Duvic offers to Josephs a consultant's position at M.D. Anderson as part of her search for a new Mohs surgeon after Jackson's resignation, Duvic states: "As we discussed, there is a need for a consultant to do Mohs here until a permanent person can be identified and a need to identify a person in a timely manner." Letter from Madeleine Duvic, M.D. to Aaron Josephs, M.D., September 23, 1999 (Ex. 23 to Plaintiff's Response).

28. *See* General Appropriations Act, 75th Leg., R.S. Ch. 1452, Art. IX, § 52 (attached as Exhibit 36 to Plaintiff's Response); Agreement for Participation in Physicians Referral Service (Attached as Exhibit I to Callender Affidavit).

tain her outside practice, or (ii) fashion a business plan with the hopes of starting a cosmetic surgery practice at M.D. Anderson.

Thus, Jackson has failed to show that Defendants acted differently under nearly identical circumstances when they hired Josephs.[29] Jackson has failed to factually support her contentions of disparate treatment by Defendants in regard to the private practice issue. Jackson has failed to adduce evidence that Defendants' explanation is false.

### 3. Conspiracy to Replace Plaintiff

■ Jackson alleges that Defendants engaged in a conspiracy to replace her with another Mohs surgeon after one year. Jackson contends that this conspiracy was discriminatory because the intended replacement was white and less qualified than her for the Mohs' surgery position. Jackson cites as evidence of the conspiracy (i) the discrepancies between the type of position she was promised during her in-terview, (tenure track with a renewable one-year contract), and the type of position she was presented with when she commenced work at M.D. Anderson (non-tenure track with a nonrenewable one-year contract), (ii) the Algarin Memo, dated June 5, 1998, in which Gagel and Duvic discuss the option of hiring Jackson as an "interim solution" until Algarin completes a Mohs training program,[30] (iii) Duvic's handwritten notes that Jackson construes as supporting her conspiracy allegations,[31] and (iv) Defendants' attempts to hire a second Mohs surgeon without Jackson's knowledge or consent. Jackson claims that the other surgeon being considered as a replacement by Defendants was Algarin, who still had one year of Mohs surgery training to complete at the time Jackson was hired by M.D. Anderson. Viewed in the light most favorable to Jackson, this evidence supports the proposition that Jackson was not Defendants' first choice for the Mohs position, and that they were sloppy at best in their pre-employment negotiations with her.[32] Nothing in this

**29.** Jackson complains that, unlike Josephs, she was never *offered* at the outset a consultancy arrangement, and she was not adequately informed by Defendants regarding her employment options before she accepted the offer from Defendants. *See* Plaintiff's Rebuttal, at 3–4. This is not evidence of race discrimination; rather, this is evidence of a failure by Plaintiff and Defendants to become informed about the applicable regulations and to adequately reach firm agreement on the employment terms.

**30.** *See* Exhibit 1 to Plaintiff's Response.

**31.** *See* Exhibit 2 to Plaintiff's Response. Duvic maintains the handwritten notes were made during a conversation with Gagel regarding the procedures for hiring Jackson. *Duvic Deposition,* at 19–20. Duvic disputes Jackson's understanding of the notes. *Id.* at 24–28.

**32.** Defendants do not deny that they considered, among other possibilities, hiring Jackson for one year with the intention of replacing her with another surgeon. Duvic acknowledges that she considered the idea of hiring Jackson only for the short-term as a way of handling the expansion of the Mohs surgery unit, but abandoned this strategy as inappropriate. Duvic Affidavit, Def.App., at 0148. Duvic testified that she decided to seek the appointment of an additional Moh's surgeon instead. *Id.* Def. App., at 0148–49. Defendants explain that Duvic was already familiar with Algarin before the Mohs position at M.D. Anderson was created. *Id.* Def.App., at 0146. Duvic had worked with Algarin on research projects and was impressed with her' work. *Id.* Thus, Duvic wanted to hire Algarin for M.D. Anderson. *Id.* Third, Defendants changed the "nonrenewable" language in Jackson's contract once Jackson had notified them of the discrepancy. Jackson Deposition, at 44–47. Indeed, Defendants in fact renewed Jackson's contract for another year shortly before she resigned and they never hired Algarin. Jackson, however, was never placed on tenure track. Defendants and Jackson had several inconclusive conversations with Gagel regarding tenure

evidence establishes that Jackson was treated differently from other physicians in nearly identical circumstances, or that racial animus was present.[33] Jackson does not offer evidence to show Defendants' evidence is false or a pretext for discrimination. Jackson does not dispute the accuracy of Defendants' explanations. Therefore, the Court holds that Defendants are entitled to summary judgment on Jackson's theory that Defendants conspired to replace Jackson.

### 4. Additional Evidence of Discrimination

■ Jackson presents additional evidence of discrimination against African–American physicians at M.D. Anderson in support of her claims. Presumably, Jackson intends for these matters to constitute direct or circumstantial evidence of racially discriminatory intent by Defendants that supports her contention that Defendants' actions as to her were racially motivated. Jackson presents anecdotal evidence of Gagel's alleged discriminatory treatment of Dr. Vickie Shannon, an African–American doctor employed by M.D. Anderson. Jackson also offers evidence that she did not receive adequate secretarial and medical support while at M.D. Anderson as support for her contention the she suffered discrimination. In addition, Jackson offers statistical evidence regarding the number of African–American doctors employed by M.D. Anderson. Defendants object to this evidence because they contend that (i) it is inadmissible and (ii) it does not support Jackson's claims.

A plaintiff in Title VII discrimination cases can introduce anecdotal evidence of discrimination against other employees to establish that a defendant's reasons are a pretext for discrimination. *Wyvill v. United Co. Life Ins.,* 212 F.3d 296, 302 (5th Cir.2000). However, to be admissible, such evidence must relate to employees who are similarly situated to the plaintiff. *Id.* Such evidence will not be admissible if it relates to "former employees who had different supervisors than the plaintiff, who worked in different parts of the employer's company, or whose terminations were removed in time from the plaintiff's termination." *Id.*

Jackson's anecdotal evidence regarding Shannon fails to save her claims. This evidence does not prove that Defendants' explanations for their treatment of Jackson were false, nor otherwise supporting her claim for discrimination. Vickie Shannon is an African–American physician who specializes in pulmonary medicine, critical care, and internal medicine. Deposition of Vickie Shannon, M.D., at 6–7 (Exhibit 30 to Plaintiff's Response). Shannon has worked at M.D. Anderson since 1993, and is currently an associate professor of medicine in the pulmonary department with a joint position in the critical care department. *Id.* Shannon is supervised by Gagel. Jackson contends—but Shannon does not—that Gagel has discriminated against Shannon in favor of Caucasian physicians at M.D. Anderson. Shannon's experience at M.D. Anderson is not probative of Jackson's own race discrimination claims. First, Shannon has not been shown to be in circumstances nearly identical to Jackson. Shannon works in a completely different medical department of M.D.

---

track. Jackson Deposition, at 157, 224–25. In those discussions, Gagel indicated a willingness to consider allowing Jackson to switch into a tenure track position. Jackson Deposition, at 224–25; E–Mail from Robert F. Gagel to Brooke A. Jackson (Dec. 18, 1998, 06:48 PM) (stating that Gagel would like to "begin to discuss the all important promotion and tenure process" with Jackson).

**33.** Again, the Court notes that it is likely that this same evidence would show that Jackson was not similarly situated to her comparators.

Anderson, has completely different responsibilities from Jackson, and has her own unique medical training and specializations. Jackson has not established that any Defendant was responsible for the decision to give Shannon—five years prior to Jackson—a non-tenure track appointment.[34]

█ Jackson's contentions regarding inadequate secretarial and medical support while at M.D. Anderson also fail. Jackson presents no evidence that any of these conditions were the result of racial discrimination. For example, she claims that she was assigned to conduct her clinics at a time when no residents were available to assist her. Nevertheless, Jackson admits that there were fewer residents assigned to the dermatology department than physicians staffed in the department.[35] She also has no evidence to show that she was nearly identical to any of the other physicians in the dermatology department in terms of seniority and experience.[36]

Second, Jackson claims that she received inadequate administrative support from the secretary she shared with Duvic. Jackson claims that her secretary, Dorothy Bivins, consistently told her that she was too busy assisting Duvic. Jackson Deposition, at 136. Jackson never spoke to Duvic or Gagel about her dissatisfaction in this regard, nor otherwise attempted to investigate and remedy this problem. Id. at 136–37.

Third, Jackson claims that Duvic unjustifiably demanded that the histotechnician hired to assist Jackson in the Mohs surgery unit also perform work for Duvic. Yet Jackson acquiesced to Duvic's requests and the two worked out an arrangement whereby the histotechnician would spend a specified amount of time each week working for Duvic. Jackson Deposition, at 143–44. Nothing about this compromise indicates Defendants' explanations were false.

Finally, Jackson complains that she was made to order equipment and supplies for the Mohs surgery program without administrative assistance. However, Jackson admits that she never inquired whether there was anyone available to assist her with the equipment purchases. She concedes that she was offered such assistance after the first six weeks of her employment. Jackson Deposition, at 140–41.

None of Defendants' explanations as to Jackson's complaints regarding M.D. Anderson support staff have been shown to be false. There is no evidence of racial animus. Accordingly, the Court finds that

---

**34.** Shannon did not receive a tenure track position when she first was hired at M.D. Anderson in 1993, five years before Jackson. Shannon Deposition, at 7. Furthermore, it is not clear that Gagel was involved in the decision to give Shannon a non-tenure track appointment in the Pulmonary Department, a section of M.D. Anderson completely separate from the Dermatology Department where Jackson worked. There is no showing that the needs, operations or management of the two departments ever overlapped, let alone somehow were similar for analytical purposes. On this issue, Shannon does not mention Gagel by name, but instead refers to the "person who's no longer head of the department." Id. at 8–9. Jackson's attorney did not ask Shannon for the identity of that person. Id.

**35.** Jackson states that M.D. Anderson would be assigned around four residents per month, two of which would be assigned to the dermatology clinic. Jackson Deposition, at 127. Jackson names at least five physicians, including herself, in the dermatology department who required regular resident assistance. Id. at 122.

**36.** In fact, Jackson admits during her deposition that, to the extent to which she split her time at M.D. Anderson between Mohs surgery and the dermatology department, her position was "unique." Jackson Deposition, at 122, 142.

these conditions fail to support Jackson's racial discrimination claims.

■ Jackson's attempt to use rudimentary statistical evidence also fails. She presumably uses this evidence as circumstantial evidence of discriminatory intent. For statistical evidence to challenge an employer's discriminatory practices to be probative of discriminatory intent, the evidence must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market. *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1286–87 (5th Cir. 1994). In general, however, courts are highly skeptical of statistical evidence. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1185 (5th Cir.1996). Thus, while statistical evidence may be probative of pretext in limited circumstances, it usually cannot rebut the employer's articulated nondiscriminatory reasons. *Id.* The probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination. *Id.*

Jackson presents to the Court the unrebutted contention that only eleven of over 700 physicians at M.D. Anderson were African–American in 1998–99, at the time Jackson was employed there. However, this statistical evidence fails to demonstrate, or even suggest discriminatory practices. Jackson fails to make any comparison between the racial composition of M.D. Anderson's physicians and that of the relevant qualified applicant pool. Thus, the Court finds that Jackson's statistical evidence also fails to raise a genuine question of material fact to defeat Defendants summary judgment motion.

## VII. *CONCLUSION*

Based on the foregoing, the Court concludes that Jackson has failed to present a genuine issue of material fact on any asset of her Title VII claim. It is therefore

**ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Title VII Claim is **GRANTED.** It is further

**ORDERED** that Plaintiff's sole remaining claim in this case, her Title VII claim, is **DISMISSED with prejudice.**